IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNS ENERGY CORPORATION,
an Arizona corporation, and
TUCSON ELECTRIC POWER COMPANY,
an Arizona corporation,

      Plaintiffs,

vs.                                                                                    No. _____

SHIVER SOUTHWEST, LLC, an Arizona
limited liability company, JAMES B.
SHIVER, JR., and JACOB B. SHIVER,

      Defendants.

**COMPLAINT FOR FRAUDULENT MISREPRESENTATION,
NEGLIGENT MISREPRESENTATION, SUCCESSOR LIABILITY,
VOIDABLE TRANSACTIONS, CIVIL CONSPIRACY,
AND UNJUST ENRICHMENT**

Plaintiffs UNS Energy Corporation and Tucson Electric Power Company, by and through their counsel Law Office of Stephen B. Waller, LLC (Stephen B. Waller) for their Complaint state:

1.      Plaintiff Tucson Electric Power Company ("TEP") is an Arizona corporation with its principal place of business in Pima County, Arizona.

2.      Plaintiff UNS Energy Corporation ("UNS" and collectively with TEP, the "Plaintiffs") is an Arizona corporation with its principal place of business in Pima County, Arizona.

1

3.      UNS is the parent company of TEP.

4.      Defendant Shiver Southwest, LLC ("Shiver Southwest") is an Arizona limited liability company that was organized in the year 2007.

5.      Defendant James B. Shiver Jr. a/k/a Jamey Shiver ("James Shiver") is domiciled in and is a citizen of Santa Fe County, New Mexico.

6.      Defendant Jacob B. Shiver a/k/a Jake Shiver ("Jacob Shiver") is domiciled in and is a citizen of Santa Fe County, New Mexico.

7.      Shiver Southwest, James Shiver, and Jacob Shiver are collectively referred to herein as "Defendants."

8.      Upon information and belief, the only members of Shiver Southwest are James Shiver and Jacob Shiver, who are both domiciled in and citizens of Santa Fe County, New Mexico.

9.      The amount in controversy in this matter exceeds $75,000.00, exclusive of interest and costs.

10.     There is complete diversity between Plaintiffs, who are both citizens of only Arizona, and Defendants, who are citizens of only New Mexico.

11.     This Court therefore has original jurisdiction in this matter pursuant to 28 U.S.C. 1332(a).

12.     Venue is proper in the United States District Court for the District of New Mexico pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are residents of the State of New Mexico or, in the alternative, because one or more Defendants reside in the District of New Mexico.

13.     In the alternative, venue is proper in the United Sates District Court for the District of New Mexico pursuant to 28 U.S.C. § 1391(b)(2) because the District of New Mexico is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

14.     Non-party Shiver Construction Company ("SCC") is a New Mexico corporation that was incorporated in the year 1972.

15.     Publicly-available records of the Office of the New Mexico Secretary of State, Corporations Division, identify James Shiver as a Vice President, Secretary, Director, and Registered Agent of SCC.

16.     Publicly-available records of the Office of the New Mexico Secretary of State, Corporations Division, indicate that SCC remains in existence today as a New Mexico domestic profit corporation that has never been merged or converted into any other business entity or type of business entity.

17.     Publicly-available records of the Office of the New Mexico Secretary of State, Corporations Division, identify Jacob Shiver as a Vice President, Treasurer, and Director of SCC.

18.     On or about January 31, 2020, UNS (on behalf of itself and its subsidiaries expressly including TEP) and SCC entered into that certain *General Conditions for Construction Services Agreement* (the "General Agreement") which provides the general terms and conditions applicable to any construction project performed by SCC for any UNS subsidiary and authorizes any UNS subsidiary, expressly including TEP, to enter into specific scopes of work that would provide contractual requirements governing a specific construction project.

19.     On or about January 31, 2020, TEP and SCC also entered into that certain *Scope of Work and Construction Specifications for Tucson Electric Power Company Oso Grande Wind Project Operations and Maintenance Building* (the "Scope of Work") for the construction of the Operations and Maintenance Building at TEP's Oso Grande Wind Farm located in Lea and Chaves Counties, New Mexico (the "Project").

20.     The Scope of Work is issued under, and incorporates by reference, the General Agreement. The Scope of Work and General Agreement collectively constituted the construction contract between SCC and Plaintiffs for the Project and are hereinafter collectively referred to as the "Construction Agreement."

21.     The Construction Agreement identified SCC as "Contractor."

22.     Jacob Shiver, identifying himself as "Owner/CEO," executed the Construction Agreement on behalf of SCC.

23.     The Construction Agreement did not make any mention of Shiver Southwest.

24.     Shiver Southwest was never a party to the Construction Agreement.

25.     The Defendants had both constructive and actual knowledge that SCC, rather than Shiver Southwest, was the sole general contractor (or "Contractor") hired by TEP pursuant to the Construction Agreement.

26.     For example, as shown by that certain Agreement dated August 27, 2020 between SCC and Northern Constructors, Inc. (a company which is believed to be unaffiliated with any Defendant in this matter), which contract was for the original sum of $328,335.00, SCC used its "Shiver Construction" letterhead and identified the "Contractor" as "SHIVER CONSTRUCTION

4

COMPANY (hereinafter Contractor) an organization existing under the laws of the State of New Mexico[.]"

27.     Section 13 of the aforementioned Agreement between SCC and Northern Constructors, Inc. also specifically referenced the Construction Agreement as the "Prime Contract."

28.     On or about January 27, 2020, James Shiver executed a document titled *Supplier Fact Sheet Form* (the "Supplier Form") that was subsequently delivered to TEP.

29.     The "Organization Section" of the Supplier Form included the information referenced in Paragraphs 30, 31, and 32 below.

30.     The Supplier Form identified "Shiver Construction Company" as the supplier.

31.     The Supplier Form indicated that the "legal structure" of Shiver Construction Company was "Corporation" rather than "LLC" or other options listed.

32.     In the data field titled "Federal Employer's Tax Id Number," the Supplier Form provided the number ending in -1075, which is believed to be the correct federal tax identification number for Shiver Construction Company, the New Mexico corporation.

33.     The separate "Payment Section" of the Supplier Form provided TEP with the financial-institution name BBVA and that entity's routing number; a checking-account number ending in -4025; and the "Account Name" of Shiver Southwest, LLC.

34.     As used in this Complaint, the term "BBVA" means BBVA USA a/k/a BBVA Bank, a financial institution that (previously known as Compass Bank) that was merged into PNC Bank, National Association during the month of June, 2021.

35.     At all times relevant to this matter, Shiver Southwest was the sole owner of checking account number -4025 at BBVA.

36.     The aforementioned checking account number -4025 at BBVA is hereinafter referenced as the "4025 Account."

37.     Upon information and belief, SCC did not own or co-own any bank account at BBVA during the period of time from January 2020 to the present day.

38.     Shiver Southwest never requested or obtained any agreement from TEP to have payments under the Construction Agreement made to Shiver Southwest (a non-party to the contract) rather than to SCC, which was the sole "Contractor" party to the Construction Agreement between SCC and Plaintiffs.

39.     The Construction Agreement required SCC, as Contractor, to periodically complete and submit to TEP a document titled *Application and Certificate for Payment* (each hereinafter referred to as a "Payment Application") to report work completed and to request that TEP make payments to SCC pursuant to the Construction Agreement.

40.     On or about February 3, 2020, SCC electronically transmitted its Payment Application number 1 to TEP to request payment in the amount of $219,749.64 pursuant to the Construction Agreement.

41.     On or about February 10, 2020, TEP caused funds in the amount of $219,748.64 to be paid from TEP to the 4025 Account pursuant to an ACH (automated clearinghouse) electronic financial transaction.

42.     Shiver Southwest, as the sole owner of the 4025 Account, received the aforementioned $219,748.64 electronic payment from TEP on or about February 11, 2020.

6

43.     On or about February 20, 2020, SCC electronically transmitted to TEP its Payment Application number 2, signed by Jacob Shiver, requesting payment in the amount of $70,312.68 pursuant to the Construction Agreement.

44.     On or about March 11, 2020, TEP caused funds in the amount of $70,312.68 to be paid from TEP to the 4025 Account pursuant to an ACH electronic financial transaction.

45.     Shiver Southwest, as the sole owner of the 4025 Account, received the aforementioned $70,312.68 electronic payment from TEP on March 12, 2020.

46.     On or about March 25, 2020, SCC electronically transmitted to TEP its Payment Application number 3, signed by Jacob Shiver (as "Jake Shiver, VP"), requesting payment in the amount of $263,396.97 pursuant to the Construction Agreement.

47.     On or about April 3, 2020, TEP caused funds in the amount of $258,129.03 to be paid from TEP to the 4025 Account pursuant to an ACH electronic financial transaction.

48.     Shiver Southwest, as the sole owner of the 4025 Account, received the aforementioned $258,129.03 electronic payment from TEP on or about April 6, 2020.

49.     On or about April 27, 2020, SCC electronically transmitted to TEP its Payment Application number 4, electronically signed by Jacob Shiver (as "Jake Shiver, VP"), requesting payment in the amount of $181,276.68 pursuant to the Construction Agreement.

50.     On or about May 8, 2020, TEP caused funds in the amount of $181,276.68 to be paid from TEP to the 4025 Account pursuant to an ACH electronic financial transaction.

51.     Shiver Southwest, as the sole owner of the 4025 Account, received the aforementioned $181,276.68 electronic payment from TEP on or about May 11, 2020.

52.     By the end of May, 2020, TEP had delivered a total of $729,467.03 to the 4025 Account pursuant to the Construction Agreement and in response to the Payment Applications numbered 1 through 4, but none of the Defendants provided TEP with any notice that those funds had been received by Shiver Southwest (a non-party to the Construction Agreement) rather than contract-party SCC.

53.     On or about May 22, 2020, SCC electronically transmitted to TEP its Payment Application number 5, electronically signed by Jacob Shiver (as "Jake Shiver, VP"),  requesting payment in the amount of $707,425.80 pursuant to the Construction Agreement.

54.     On or about June 8, 2020, SCC electronically transmitted to TEP a revised "Application and Certificate for Payment" number 5, electronically signed by Jacob Shiver (as "Jake Shiver, VP"), requesting payment in the amount of $794,757.80 (an increase of $87,332.00) pursuant to the Construction Agreement.

55.     On or about June 5, 2020, TEP caused funds in the amount of $707,425.80 to be paid from TEP to the 4025 Account pursuant to an ACH electronic financial transaction.

56.     Shiver Southwest, as the sole owner of the 4025 Account, received the aforementioned $707,425.80 electronic payment from TEP on or about June 8, 2020.

57.     On or about June 15, 2020, TEP caused funds in the amount of $87,332.00 to be paid from TEP to the 4025 Account pursuant to an ACH electronic financial transaction.

58.     Shiver Southwest, as the sole owner of the 4025 Account, received the aforementioned $87,332.00 electronic payment from TEP on or about June 15, 2020.

59.     On or about June 25, 2020, SCC electronically transmitted to TEP its Payment Application number 6, signed by James Shiver (as "Jamey Shiver, President"), requesting payment in the amount of $795,575.89 pursuant to the Construction Agreement.

60.     On or about July 10, 2020, TEP caused funds in the amount of $795,575.89 to be paid from TEP to the 4025 Account pursuant to an ACH electronic financial transaction.

61.     Shiver Southwest, as the sole owner of the 4025 Account, received the aforementioned $795,575.89 electronic payment from TEP on or about July 13, 2020.

62.     On or about July 24, 2020, SCC electronically transmitted to TEP its Payment Application number 7, electronically signed by James Shiver (as "Jamey Shiver, President"), requesting payment in the amount of $346,810.00 pursuant to the Construction Agreement.

63.     On or about August 7, 2020, TEP caused funds in the amount of $346,810.00 to be paid from TEP to the 4025 Account pursuant to an ACH electronic financial transaction.

64.     Shiver Southwest, as the sole owner of the 4025 Account, received the aforementioned $346,810.00 electronic payment from TEP on or about August 10, 2020.

65.     On or about August 25, 2020, SCC electronically transmitted to TEP its Payment Application number 8 requesting payment in the amount of $386,235.58 pursuant to the Construction Agreement.

66.     On or about September 9, 2020, TEP caused funds in the amount of $386,235.88 to be paid from TEP to the 4025 Account pursuant to an ACH electronic financial transaction.

67.     Shiver Southwest, as the sole owner of the 4025 Account, received the aforementioned $386,235.88 electronic payment from TEP on or about September 10, 2020.

68.     SCC electronically transmitted to TEP its Payment Application number 9 requesting payment pursuant to the Construction Agreement.

69.     On or about October 9, 2020, in response to SCC's Payment Application number 9, TEP caused funds in the amount of $621,204.23 to be paid from TEP to the 4025 Account pursuant to an ACH electronic financial transaction.

70.     Shiver Southwest, as the sole owner of the 4025 Account, received the aforementioned $621,204.23 electronic payment from TEP on or about October 13, 2020.

71.     On or about October 23, 2020, SCC electronically transmitted to TEP its Payment Application number 10 requesting payment in the amount of $452,874.34 pursuant to the Construction Agreement.

72.     On or about November 6, 2020, TEP caused funds in the amount of $452,874.34 to be paid from TEP to the 4025 Account pursuant to an ACH electronic financial transaction.

73.     Shiver Southwest, as the sole owner of the 4025 Account, received the aforementioned $452,874.34 electronic payment from TEP on or about November 9, 2020.

74.     On or about February 16, 2021, SCC electronically transmitted to TEP its "Final" Payment Application, electronically signed by James Shiver (as "Jamey Shiver, President"), requesting payment in the amount of $113,696.59 pursuant to the Construction Agreement.

75.     On or about March 3, 2021, TEP caused funds in the amount of $113,696.59 to be paid from TEP to the 4025 Account pursuant to an ACH electronic financial transaction.

76.     Shiver Southwest, as the sole owner of the 4025 Account, received the aforementioned $113,696.59 electronic payment from TEP on or about March 4, 2021.

77.     From February 10, 2020 through at least March 3, 2021, Shiver Southwest received a total amount from TEP of at least $4,240,000.00 all of which was deposited in Shiver Southwest's 4025 Account.

78.     During the period of time from February 10, 2020 through at least March 3, 2021, none of Shiver Southwest or any of its members or officers ever informed any of the Plaintiffs that any of the payments made by TEP pursuant to the Construction Agreement between Plaintiffs and SCC had been received by Shiver Southwest rather than by SCC.

79.     During the period of time from February 10, 2020 through at least March 3, 2021, none of Shiver Southwest or any of its members or officers ever provided Plaintiffs with any updated, amended, or corrected bank-account information that would cause TEP to make future ACH payments to a bank account other than the 4025 Account that was solely owned by Shiver Southwest.

80.     During the period of time from February 10, 2020 through at least March 3, 2021, Shiver Southwest did not have any legal or contractual relationship with TEP and did not provide goods or services to TEP, yet Shiver Southwest received more than $4,240,000.00 from TEP as the result of Defendants' conduct.

81.     Shiver Southwest never requested or obtained any permission from Plaintiffs for Shiver Southwest to assume the role of "Contractor" for purposes of the Construction Agreement.

82.     Shiver Southwest never requested or obtained any permission from Plaintiffs for Shiver Southwest to be engaged as any "subcontractor" for purposes of the Construction Agreement or for any other purpose.

11

83.     None of the Defendants ever informed Plaintiffs that Shiver Southwest had any involvement, of any type, with the Project.

84.     However, upon information and belief, in the Defendants' dealings with one or more other subcontractors for the Project, the Defendants held out Shiver Southwest as the general contractor (or "Contractor") for the project.

85.     For example, as shown by some of the below-described claims of lien (recorded by subcontractors) that were recorded in the records of the Clerk of Chaves County, New Mexico, least two subcontractors stated under oath that such subcontractors were employed by Shiver Southwest, LLC.

86.     During the period of time from February 10, 2020 through at least March 3, 2021, while the obligations of the "Contractor" under the Construction Agreement were purportedly being performed by contract-party SCC, the Defendants failed to issue certain required payments to subcontractors and suppliers performing work on the Project even though TEP had timely delivered funds for that purpose to the 4025 Account in response to the Payment Applications that Defendants submitted to TEP.

87.     The payments that the Defendants failed or refused to make to such subcontractors and suppliers totaled $514,512.06, and the Defendants' failure or refusal to make such payments resulted in multiple subcontractors and suppliers recording claims of lien against TEP's real property.

88.     After TEP demanded that contract-party SCC resolve the aforementioned claims of lien, but SCC failed or refused to do so, TEP was eventually required to pay the claimed amounts to the affected subcontractors and suppliers so as to clear the title to TEP's real property, even

12

though TEP had already paid funds to the 4025 Account for the purpose of having all Project subcontractors and suppliers timely paid.

89.     On February 9, 2022, in case number 1:22-cv-00087-JG-LF ("Case 87") in the United States District Court for the District of New Mexico, UNS and TEP filed suit against SCC in connection with SCC's failures to pay certain subcontractors and suppliers as described above.

90.     SCC failed to appear in Case 87.

91.     On January 5, 2023, in Case 87, the District Court filed its Final Judgment (Doc. 30) and incorporated Order Adopting Magistrate Judge's Proposed Findings and Recommended Disposition (Doc. 29), which are collectively referred to here as the "January 2023 Judgment."

92.     The January 2023 Judgment entered judgment in favor of UNS and TEP, and against SCC, for treble damages in the amount of $1,543.536.18; interest on $514,512.06 computed at one and one-half percent per month beginning on March 10, 2021, until paid; attorney's fees in the amount of $33,854.75; and costs in the amount of $1,176.50.

93.     It was only in the course of post-judgment discovery that UNS and TEP learned that all of the payments made by TEP pursuant to the Construction Agreement had been received by a bank account owned solely by Shiver Southwest, rather than any account owned by the Project's general contractor, SCC.

## Count I

### Fraudulent Misrepresentation
(against Shiver Southwest, James Shiver, and Jacob Shiver)

94.     Plaintiffs reallege the allegations set forth in Paragraphs 1–93 above as though fully set forth herein.

95.     During the period of time from February 10, 2020 through at least March 3, 2021, each of Shiver Southwest and its members James Shiver and Jacob Shiver made by omission representations of fact that funds paid by TEP pursuant to the Construction Agreement were received by TEP's contract counter-party, SCC.

96.     During the period of time from February 10, 2020 through at least March 3, 2021, each of Shiver Southwest and its members James Shiver and Jacob Shiver made by omission representations of fact that funds paid by TEP pursuant to the Construction Agreement had not been received by Shiver Southwest.

97.     Such representations of fact, by omission, were not true.

98.     Each of Shiver Southwest and its members James Shiver and Jacob Shiver made such representations by omission knowingly or recklessly.

99.     Such representations by omission were made with the intent to deceive and to induce Plaintiffs to rely on them.

100.    Plaintiffs did rely on such representations by omission.

101.    During the period of time from February 10, 2020 through at least March 3, 2021, each of Shiver Southwest and its members James Shiver and Jacob Shiver made representations of fact that Shiver Southwest was the "Contractor" and the entity entitled to payment of funds from TEP pursuant to the Construction Agreement.

102.    Such representations of fact were not true.

103.    Each of Shiver Southwest and its members James Shiver and Jacob Shiver made such representations knowingly or recklessly.

104.    Such representations were made with the intent to deceive and to induce Plaintiffs to rely on them.

105.    Plaintiffs did rely on such representations.

106.    For such fraudulent misrepresentations, Plaintiffs are entitled to an award of actual damages against each of Shiver Southwest, James Shiver, and Jacob Shiver for the total amount of funds that TEP paid to the 4025 Account owned solely by Shiver Southwest.

107.    In the alternative, for such fraudulent misrepresentations, Plaintiffs are entitled to an award of actual damages against each of Shiver Southwest, James Shiver, and Jacob Shiver for (a) the outstanding amount of the January 2023 Judgment or, at a minimum, (b) the original amount of $514,512.06 that Defendants failed or refused to pay to Project subcontractors and suppliers.

108.    For such fraudulent misrepresentations, Plaintiffs are also entitled to an award of punitive damages against each of Shiver Southwest, James Shiver, and Jacob Shiver.

## Count II

### Negligent Misrepresentation

(against Shiver Southwest, James Shiver, and Jacob Shiver)

109.    Plaintiffs reallege the allegations set forth in Paragraphs 1–108 above as though fully set forth herein.

110.    During the period of time from February 10, 2020 through at least March 3, 2021, each of Shiver Southwest and its members James Shiver and Jacob Shiver made by omission material representations of fact that funds paid by TEP pursuant to the Construction Agreement were received by TEP's contract counter-party, SCC.

15

111.    During the period of time from February 10, 2020 through at least March 3, 2021, each of Shiver Southwest and its members James Shiver and Jacob Shiver made by omission material representations of fact that funds paid by TEP pursuant to the Construction Agreement had not been received by Shiver Southwest.

112.    Such representations of fact, by omission, were not true.

113.    Each of Shiver Southwest and its members James Shiver and Jacob Shiver made such representations by omission knowingly or recklessly.

114.    Such representations by omission were made with the intent to deceive and to induce Plaintiffs to rely on them.

115.    Plaintiffs did rely on such representations by omission.

116.    During the period of time from February 10, 2020 through at least March 3, 2021, each of Shiver Southwest and its members James Shiver and Jacob Shiver made representations of fact that Shiver Southwest was the "Contractor" and the entity entitled to payment of funds from TEP pursuant to the Construction Agreement.

117.    Such representations of fact were not true.

118.    Each of Shiver Southwest and its members James Shiver and Jacob Shiver made such representations knowingly or recklessly.

119.    Such representations were made with the intent to deceive and to induce TEP to rely on them.

120.    Plaintiffs did rely on such representations.

121.    For such negligent misrepresentations, Plaintiffs is entitled to an award of actual damages against each of Shiver Southwest, James Shiver, and Jacob Shiver for the total amount of funds that TEP paid to the 4025 Account owned solely by Shiver Southwest.

122.    In the alternative, for such negligent misrepresentations, Plaintiffs are entitled to an award of actual damages against each of Shiver Southwest, James Shiver, and Jacob Shiver for (a) the outstanding amount of the January 2023 Judgment or, at a minimum, (b) the original amount of $514,512.06 that Defendants failed or refused to pay to Project subcontractors and suppliers.

123.    For such negligent misrepresentations, TEP is also entitled to an award of punitive damages against each of Shiver Southwest, James Shiver, and Jacob Shiver.

## Count III

### Successor Liability

(against Shiver Southwest)

124.    Plaintiffs reallege the allegations set forth in Paragraphs 1–123 above as though fully set forth herein.

125.    Section 13.6 of the General Agreement states in part: "This Agreement shall be binding on and inure to the benefit of the Parties, and their respective successors and permitted assigns."

126.    Each of the Payment Applications submitted to TEP identified Shiver Southwest, as (a) the "Contractor" or (b) the "Subcontractor" while referencing TEP as the "Contractor".

127.    As described more fully in Paragraphs 28 through 34 above, Shiver Southwest identified the 4025 Account (solely owned by Shiver Southwest) as the account to which TEP

should make all payments pursuant to the Construction Agreement, and Shiver Southwest never provided TEP with any corrections or changes to that receiving-account information.

128.    By the actions and omissions of Shiver Southwest and its members James Shiver and Jacob Shiver as described in the foregoing paragraphs and elsewhere in this Complaint, Shiver Southwest held itself out as the successor of SCC.

129.    In the alternative, Shiver Southwest was the de facto successor of SCC for all purposes relating to the Construction Agreement.

130.    Pursuant to the Construction Agreement specifically Section 13.6 of the General Agreement, and applicable law, Shiver Southwest, as successor to SCC, is liable to Plaintiffs for all liabilities of SCC under or otherwise relating to the Construction Contract.

131.    Plaintiffs previously filed suit against SCC in Case 87 for SCC's breaches of the Construction Agreement and other violations of law.

132.    Pursuant to the January 2023 Judgment in Case 87, the District Court entered judgment in favor of Plaintiffs, and against SCC, for treble damages in the amount of $1,543.536.18; interest on $514,512.06 computed at one and one-half percent per month beginning on March 10, 2021, until paid; attorney's fees in the amount of $33,854.75; and costs in the amount of $1,176.50.

133.    The aforementioned monetary judgment awarded against SCC remains fully unpaid.

134.    By acting as the successor to SCC for purposes of the Construction Contract and receiving from TEP more than $4,240,000.00 deposited into the 4025 Account (solely owned by Shiver Southwest) for purposes of the Project, while (a) failing or refusing to pay approximately

$514,512.06 to Project subcontractors and suppliers and (b) failing to present any bona fide dispute or justification to UNS or TEP or to the District Court in Case 87, Shiver Southwest caused harm to UNS and TEP.

135.     Without limiting any of the other relief requested by this Complaint, the Court should find that Shiver Southwest, as successor to SCC for purposes of the Construction Agreement, is liable to Plaintiffs for all unpaid amounts of the aforementioned January 5, 2023 judgment entered against SCC.

## Count IV

**(Uniform Voidable Transactions Act — NMSA 1978, § 56-10-18 —
Transfers Voidable As To Present or Future Creditors)**
(against Shiver Southwest, James Shiver, and Jacob Shiver)

136.     Plaintiffs reallege the allegations set forth in Paragraphs 1–135 above as though fully set forth herein.

137.     The Uniform Voidable Transactions Act, NMSA 1978, §§ 56-10-14 to -29 (2015) (hereinafter the "Act") became effective on January 1, 2016 and has remained in effect at all times relevant to this matter.

138.     Shiver Southwest has been a debtor (as that term is defined in the Act) of Plaintiffs at all times since February 10, 2020, when Shiver Southwest first received (into the 4025 Account owned solely by Shiver Southwest) funds that TEP had purportedly paid to its contract-counterparty, SCC.

139.     Plaintiffs have been a creditor (as that term is defined in the Act) of Shiver Southwest at all times since February 10, 2020.

140.   Plaintiffs have had a claim (as that term is defined in the Act) against Shiver Southwest at all times since February 10, 2020.

141.   Each payment of funds from Shiver Southwest to James Shiver subsequent to February 10, 2020 constituted a transfer (as that term is used in the Act) from Shiver Southwest to James Shiver.

142.   James Shiver has been an "insider" of Shiver Southwest at all times relevant to this matter.

143.   Each payment of funds from Shiver Southwest to Jacob Shiver subsequent to February 10, 2020 constituted a transfer (as that term is used in the Act) from Shiver Southwest to Jacob Shiver.

144.   Jacob Shiver has been an "insider" of Shiver Southwest at all times relevant to this matter.

145.   At all times relevant to this matter, Shiver Southwest, as a debtor, was and remains insolvent (as that term is used in the Act).

146.   At all times relevant to this matter, Shiver Southwest, as a debtor, was and remains generally not paying its debts as they become due, for reasons other than as a result of a bona fide dispute.

147.   As just one example, in and around the month of February 2020 alone, more than fifty payments issued by Shiver Southwest were returned (undeposited) for insufficient funds.

148.   Publicly-available records of the Federal Aviation Administration indicate that James Shiver, in his individual capacity, is the owner of one or more civil aircraft.

149.    A recent search of publicly-available records of the Federal Aviation Administration did not identify any aircraft owned by Shiver Southwest itself.

150.    Upon information and belief, during the period of time subsequent to June 4, 2020, funds of Shiver Southwest, in an amount to be proven at trial, were transferred to James Shiver or to third parties for the benefit of James Shiver or his family members or affiliated businesses (other than Shiver Southwest), with such transfers including, but not limited to, the following:

      a.  More than 130 checks issued from Shiver Southwest to James Shiver in the aggregate amount of at least $320,000.00;

      b.  Payments made (from one or more accounts of Shiver Southwest) via check, debit-card transaction, or credit card, for aviation-related fuel, equipment, parts, inspection services, and storage of one or more aircraft owned by persons other than Shiver Southwest;

      c.  Payment to the Treasurer of Santa Fe County, New Mexico, for ad valorem taxes (property taxes) assessed against one or more real properties owned by persons other than Shiver Southwest;

151.    Upon information and belief, during the period of time subsequent to June 4, 2020, funds of Shiver Southwest, in an amount to be proven at trial, were transferred to Jacob Shiver or to third parties for the benefit of James Shiver or his family members or affiliated businesses (other than Shiver Southwest), with such transfers including, but not limited to, the following:

      a.  More than 45 checks issued from Shiver Southwest to Jacob Shiver in the aggregate amount of at least $119,000;

b.   Numerous online transfers of funds from (a) one or more accounts of Shiver Southwest at BBVA to (b) Wells Fargo Bank account -5121, which upon information and belief is owned or co-owned by Jacob Shiver individually.

152.   Each of the transfers of funds from Shiver Southwest to James Shiver, Jacob Shiver, or to third parties for the benefit of James Shiver, Jacob Shiver, or their family members or other affiliated businesses (other than Shiver Southwest) was made with actual intent to hinder, delay, or defraud any one or more creditors of Shiver Southwest.

153.   Each of the transfers of funds from Shiver Southwest to James Shiver, Jacob Shiver, or to third parties for the benefit of James Shiver, Jacob Shiver, or their family members or other affiliated businesses (other than Shiver Southwest) was made without Shiver Southwest receiving a reasonably equivalent value in exchange for the transfer.

154.   At the time of each of the transfers of funds from Shiver Southwest to James Shiver, Jacob Shiver, or to third parties for the benefit of James Shiver, Jacob Shiver, or their family members or other affiliated businesses (other than Shiver Southwest), Shiver Southwest was engaged or was about to engage in a business or transaction for which the remaining assets of Shiver Southwest were unreasonably small in relation to the business or transaction.

155.   At the time of each of the transfers of funds from Shiver Southwest to James Shiver, Jacob Shiver, or to third parties for the benefit of James Shiver, Jacob Shiver, or their family members or other affiliated businesses (other than Shiver Southwest), Shiver Southwest intended to incur, or believed or reasonably should have believed that Shiver Southwest would incur, debts beyond Shiver Southwest's ability to pay as they became due.

156.    Each of the transfers of funds from Shiver Southwest to James Shiver, Jacob Shiver, or to third parties for the benefit of James Shiver, Jacob Shiver, or their family members or other affiliated businesses (other than Shiver Southwest) was made without Shiver Southwest was not made for present value.

157.    Each of the transfers of funds from Shiver Southwest to James Shiver, Jacob Shiver, or to third parties for the benefit of James Shiver, Jacob Shiver, or their family members or other affiliated businesses (other than Shiver Southwest), made subsequent to February 10, 2020, is voidable as to Plaintiffs.

158.    In the alternative, the Court should enter judgment in favor of Plaintiffs, and against each of James Shiver and Jacob Shiver, for the amounts of funds that were transferred from Shiver Southwest, subsequent to February 10, 2020, to James Shiver, Jacob Shiver, or third parties for the benefit of James Shiver, Jacob Shiver, or their family members or other affiliated businesses (other than Shiver Southwest).

## Count V

### (Uniform Voidable Transactions Act — NMSA 1978, § 56-10-19(A) — Transfers Voidable As To Present Creditor)
### (against Shiver Southwest, James Shiver, and Jacob Shiver)

159.    Plaintiffs reallege the allegations set forth in Paragraphs 1–158 above as though fully set forth herein.

160.    Each of the transfers of funds from Shiver Southwest to James Shiver, Jacob Shiver, or to third parties for the benefit of James Shiver, Jacob Shiver, or their family members or other affiliated businesses (other than Shiver Southwest), made subsequent to February 10, 2020, was made without Shiver Southwest receiving reasonably equivalent value in exchange for the transfer.

23

161.    At all times subsequent to February 10, 2020, Shiver Southwest was insolvent or became insolvent as a result of such transfers.

162.    Defendant James Shiver was the transferee for each of the transfers, made subsequent to February 10, 2020, of funds from Shiver Southwest to James Shiver or to third parties for the benefit of James Shiver or his family members or other affiliated businesses (other than Shiver Southwest),

163.    Defendant Jacob Shiver was the transferee for each of the transfers, made subsequent to February 10, 2020, of funds from Shiver Southwest to Jacob Shiver or to third parties for the benefit of Jacob Shiver or his family members or other affiliated businesses (other than Shiver Southwest).

164.    Each of the transfers of funds from Shiver Southwest to James Shiver, Jacob Shiver, or to third parties for the benefit of James Shiver, Jacob Shiver, or their family members or other affiliated businesses (other than Shiver Southwest), made subsequent to February 10, 2020, is voidable as to Plaintiffs.

165.    In the alternative, the Court should enter judgment in favor of Plaintiffs, and against each of James Shiver and Jacob Shiver, for the amounts of funds that were transferred from Shiver Southwest, subsequent to February 10, 2020, to James Shiver, Jacob Shiver, or third parties for the benefit of James Shiver, Jacob Shiver, or their family members or other affiliated businesses (other than Shiver Southwest).

### Count VI

### Civil Conspiracy

(against Shiver Southwest, James Shiver, and Jacob Shiver)

166.    Plaintiffs reallege the allegations set forth in Paragraphs 1–165 above as though fully set forth herein.

167.    Upon information and belief, a conspiracy between two or more of Shiver Southwest, James Shiver, and Jacob Shiver existed.

168.    Upon information and belief, specific wrongful acts were carried out by one or more of Shiver Southwest, James Shiver, and Jacob Shiver pursuant to the conspiracy.

169.    Plaintiffs were damaged as a result of such acts carried out pursuant to the conspiracy.

170.    The direct allegations pled earlier in this Complaint show the existence of a conspiracy.

171.    In the alternative, the existence of a conspiracy may be reasonably inferred from the circumstances alleged earlier in this Complaint.

172.    Upon information and belief, James Shiver and Jacob Shiver have been the controlling and dominating forces in efforts to, among other things, (a) cause TEP to pay substantial funds directly to Shiver Southwest, which did not have any contractual relationship with Plaintiffs, instead of having those funds paid to Plaintiffs' contract-counterparty SCC; (b) cause substantial funds received by Shiver Southwest from TEP to be paid to James Shiver and Jacob Shiver themselves; and (c) cause substantial funds received by Shiver Southwest from TEP to be paid to third parties for the benefit of James Shiver, Jacob Shiver, or other third parties without appropriate consideration received by Shiver Southwest.

173.    For such civil conspiracy by two or more of Shiver Southwest, James Shiver, and Jacob Shiver, Plaintiffs are entitled to actual damages against each of Shiver Southwest, James Shiver, and Jacob Shiver for the total amount of funds that TEP paid to the 4025 Account owned solely by Shiver Southwest.

174.    In the alternative, for such civil conspiracy, Plaintiffs are entitled to an award of actual damages against each of Shiver Southwest, James Shiver, and Jacob Shiver for (a) the outstanding amount of the January 2023 Judgment or, at a minimum, (b) the original amount of $514,512.06 that Defendants failed or refused to pay to Project subcontractors and suppliers.

175.    For such civil conspiracy by two or more of Shiver Southwest, James Shiver, and Jacob Shiver, each such conspirator should be found jointly and severally liable for all of the aforementioned damages claimed by Plaintiffs.

176.    For such civil conspiracy by two or more of Shiver Southwest, James Shiver, and Jacob Shiver, each such conspirator should also be found jointly and severally liable to Plaintiffs for an award of punitive damages.

**Count VII**

**Unjust Enrichment**

(against Shiver Southwest, James Shiver, and Jacob Shiver)

177.    Plaintiffs reallege the allegations set forth in Paragraphs 1–176 above as though fully set forth herein.

178.    By causing Shiver Southwest to receive a total of twelve (12) payments from TEP (during the period of time from February 2020 through March 2021), totaling over $4,240,000.00, without disclosing to Plaintiffs that those payments had all been received by an entity (Shiver Southwest) that had no contractual relationship with Plaintiffs, and also by transferring substantial

26

amounts of those funds to James Shiver, Jacob Shiver, or third parties for the personal benefit of James Shiver, Jacob Shiver, or their family members or affiliated businesses (other than Shiver Southwest) without adequate consideration to Shiver Southwest, each of the Defendants knowingly benefitted at Plaintiffs' expense in a manner such that allowance of Defendants to retain the benefits would be unjust.

179.    Defendants are liable to Plaintiffs for unjust enrichment in an amount to be proven at trial, which amount should include, but not be limited to, (a) the outstanding amount of the January 2023 Judgment or, at a minimum, (b) the original amount of $514,512.06 that Defendants failed or refused to pay to Project subcontractors and suppliers.

WHEREFORE, Plaintiffs pray the Court as follows:

A.    For judgment against each of Shiver Southwest, James Shiver, and Jacob Shiver, jointly and severally, for the amounts of funds that TEP paid directly to Shiver Southwest;

B.    For judgment against Shiver Southwest in the amount of the outstanding January 2023 Judgment;

C.    For judgment against James Shiver for the amount of the outstanding January 2023 Judgment or, in the alternative, the amount of funds paid by Shiver Southwest, subsequent to February 10, 2020, to James Shiver or to third parties for the benefit of James Shiver or his family members or affiliated businesses (other than Shiver Southwest);

D.    For judgment against Jacob Shiver for the amount of the outstanding January 2023 Judgment or, in the alternative, the amount of funds paid by

Shiver Southwest, subsequent to February 10, 2020, to Jacob Shiver or to third parties for the benefit of Jacob Shiver or his family members or affiliated businesses (other than Shiver Southwest);

E.      For an award of pre-judgment interest and post-judgment interest;

F.      For an award of punitive damages against each of Shiver Southwest, James Shiver, and Jacob Shiver; and

D.      For such other and further relief as the Court may deem just and proper.


Respectfully submitted,

*/s/ Stephen B. Waller*
Stephen B. Waller
*Attorney for UNS Energy Corporation and Tucson Electric Power Company*
Law Office of Stephen B. Waller, LLC
1933 San Mateo Blvd NE PMB 172
Albuquerque, NM 87110
(505) 230-5959 (phone)
(505) 336-9234 (fax)
swaller@wallernm.com